UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| HAROLD HUNT,<br><br>        Plaintiff,<br><br>    vs.<br><br>CPT. ROB YANTIS, individually and as an officer of the Pennington County Jail Administration; RN LAURIE GOOD, individually and as a registered nurse for the Pennington County Sheriff's Department; RN TIFFANY ALEXANDER, individually and as a registered nurse for the Pennington County Sheriff's Department; and DR. ALVIN WESSEL,<br><br>        Defendants. | CIV. 13-5041-JLV<br><br><br><br>ORDER |

## INTRODUCTION

Plaintiff Harold Hunt filed a second amended complaint against the defendants.   (Docket 37).   Count I asserts a violation of 42 U.S.C. § 1983 claiming cruel and unusual punishment under the Fourteenth Amendment against defendants Rob Yantis, Laurie Good and Tiffany Alexander ("County Defendants") while Mr. Hunt was a pre-trial detainee at the Pennington County Jail ("jail") in Rapid City, South Dakota.   Id. at pp. 9-10.   Count II asserts a medical negligence claim under the Fourteenth Amendment against Dr. Wessel for his services as a contract physician for the jail.   Id. at pp. 10-11.   The County Defendants filed an answer asserting, among other defenses, an affirmative defense of qualified immunity.   (Docket 38 at ¶ 4).   Dr. Wessel filed

an answer denying he is a state actor subject to this lawsuit or that the services he provided to plaintiff constituted medical negligence.   (Docket 41 ¶¶ 1 & 2).

Dr. Wessel filed a motion for summary judgment supported by a statement of undisputed material facts.   (Dockets 48 & 48-1).   The County Defendants filed a separate motion for summary judgment supported by their own statement of undisputed material facts.   (Dockets 55 & 57).   Mr. Hunt filed responses to both sets of statements of undisputed material facts and his own statement of material facts.   (Dockets 67, 68 & 69).   For the reasons stated below, Dr. Wessel's motion for summary judgment is granted and the County Defendants' motion for summary judgment is granted.

## STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(a), a movant is entitled to summary judgment if the movant can "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Once the moving party meets its burden, the nonmoving party may not rest on the allegations or denials in the pleadings, but rather must produce affirmative evidence setting forth specific facts showing a genuine issue of material fact exists.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).   Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude summary judgment.   Id. at 248.   "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Id. at 247-48 (emphasis in original).

If a dispute about a material fact is genuine, that is, if the evidence is that a reasonable jury could return a verdict for the nonmoving party, then summary judgment is not appropriate. Id. However, the moving party is entitled to judgment as a matter of law if the nonmoving party fails to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "There can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id.

In determining whether summary judgment should issue, the facts and inferences from those facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). In order to withstand a motion for summary judgment, the nonmoving party "must substantiate [her] allegations with 'sufficient probative evidence [that] would permit a finding in [her] favor on more than mere speculation, conjecture, or fantasy.'" Moody v. St. Charles County, 23 F.3d 1410, 1412 (8th Cir. 1994) (citing Gregory v. Rogers, 974 F.2d 1006, 1010 (8th Cir. 1992), cert. denied, 507 U.S. 913 (1993)). "A mere scintilla of evidence is insufficient to avoid summary judgment." Moody, 23 F.3d at 1412. The key inquiry is "whether the evidence presents a sufficient disagreement to require

3

submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson, 477 U.S. at 251-52.

Once the moving party meets its burden, the nonmoving party may not rest on the allegations or denials in the pleadings, but rather must produce affirmative evidence setting forth specific facts showing a genuine issue of material fact exists.  Id. at 256; see also Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2007) (mere allegations, unsupported by specific facts or evidence beyond a nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment); Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*) ("The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial.  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.") (internal quotation marks and citation omitted).  The non-moving party's own conclusions, without supporting evidence, are insufficient to create a genuine issue of material fact. Anderson, 477 U.S. at 256; Thomas, 483 F.3d at 527; Torgerson, 643 F.3d at 1042.

**UNDISPUTED MATERIAL FACTS**

The following recitation consists of the material facts undisputed by the parties.  These facts are developed from the plaintiff's second amended complaint (Docket 37), Dr. Wessel's answer (Docket 41), defendants' statements

4

of undisputed material facts (Dockets 48-1 & 57), and plaintiff's response to defendant's statement of undisputed material facts and additional statement of undisputed material facts (Dockets 67, 68 & 69).   Additional facts may be included where indicated.   Where a statement of fact is admitted by the opposing party, the court will only reference the initiating document.

Mr. Hunt was incarcerated at the Pennington County Jail beginning on or before August 25, 2012, as a pre-trial detainee awaiting a state court trial. (Docket 57 ¶ 1).   He alleges he began having digestive problems and pain on October 12, 2012.[1]   Id. ¶ 4.   On October 19, 2012, Michelle Hagan, a physician's assistant ("P.A.") employed by Dr. Wessel,[2] saw Mr. Hunt.[3]   (Docket 57 ¶¶ 5 & 6).   Following an examination, P.A. Hunt diagnosed gastroesophageal reflux disease ("GERD").   Id.   She prescribed omeprazole, a generic form of

---

[1]Mr. Hunt denies a number of the County Defendants' statements of undisputed facts as "argumentative," or "irrelevant," apparently because the statements contain the words "allege," "claims" or "concedes."   See for example Docket 68 ¶¶ 4, 7, 19 & 20.   D.S.D. Civ. LR 56.1(B) requires Mr. Hunt to "respond to each numbered paragraph . . . [with] appropriate citations to the record."   Plaintiff's responses do not direct the court to a specific portion of the record which supports a challenge to the County Defendants' statements of undisputed material facts.   The court concludes plaintiff's responses do not deny the content of the statements and the statements provide a useful historical description of Mr. Hunt's physical ailments, complaints and statements to all defendants.

[2]Dr. Wessel is a board-certified family practitioner who has practiced medicine in Rapid City and at the Pennington County Jail for a number of years. (Docket 48-1 ¶ 4).   Dr. Wessel contracted with the Pennington County Jail to provide medical care to inmates.   (Docket 41 ¶ 3).

[3]Mr. Hunt does not allege the County Defendants prevented him from seeing P.A. Hunt.   (Docket 57 ¶ 7).

Prilosec, for one week.   Id. ¶ 9.   One week later Mr. Hunt reported that although

he continued to experience a little pain, the omeprazole seemed to be working.

(Docket 69 ¶ 5).

On November 15, 2012, Mr. Hunt complained that at night his chest pain

returned and he was experiencing severe chest pain and stomach cramps.

(Dockets 57 ¶ 10 & 69 ¶ 6).   Dr. Wessel examined Mr. Hunt that day and

prescribed omeprazole twice a day.   (Dockets 57 ¶ 11 & 69 ¶ 7).   On November

21, Dr. Wessel saw Mr. Hunt during a scheduled appointment for his chest and

rib pain.   (Docket 69 ¶ 8).   Dr. Wessel's omeprazole prescription directed the

jail staff to "not stop" this dosage.   Id. ¶ 9.   Tiffany Alexander, a jail staff

registered nurse, failed to give the increased dosage and failed to notify other jail

medical staff of its increase.   Id. ¶ 10.   On November 26, Dr. Wessel gave a

verbal order to the jail medical staff to increase Mr. Hunt's omeprazole dosage.

Id. ¶ 11.

The next day Mr. Hunt informed RN Alexander that "[s]omething has

caused my digestive system to fail.   Food continues to sit for a couple of days,

making it hard for me to eat."   Id. ¶ 12.   Mr. Hunt wanted to know whether any

medication could be causing this condition and requested materials regarding

the side effects of his medications.   Id.   RN Alexander informed Mr. Hunt he

needed to give the omeprazole more time to work "since it was just restarted

. . . ."   Id. ¶ 13.   She also informed Mr. Hunt that the only new medication was

a liquid antacid which was supposed to help relieve the symptoms of upset

6

stomach, heartburn, too much stomach acid, excess gas and bloat discomfort.
Id.   Mr. Hunt told her he had not had a bowel movement for three days and "felt
full."   Id. ¶ 14.   RN Alexander prescribed a high fiber diet for the next seven
days.   Id. ¶ 15.   She told Mr. Hunt to drink more water and walk around more
and that she would put him on Dr. Wessel's patient list to discuss stool
softeners.   Id.

On November 28, 2012, Mr. Hunt sent an e-mail to RN Good telling her
he did not need a change of diet and requested to see an outside specialist
because neither Dr. Wessel nor P.A. Hagen, who Mr. Hunt thought was a
physician, had done anything to relieve his symptoms.   Id. ¶ 16; see also Docket
57 ¶ 24.   RN Good examined Mr. Hunt, found he had bowel sounds and placed
him on the schedule to be seen by a medical provider.   (Docket 69 ¶ 17; see also
Docket 57 ¶ 25).   She told Mr. Hunt to take Milk of Magnesia twice a day, take
the omeprazole as prescribed and drink liquids and exercise.   (Docket 69 ¶ 17).
On November 29 or 30 jail medical staff took Mr. Hunt's urine sample for
laboratory testing.   (Docket 69 ¶ 18).   P.A. Hagen examined the laboratory test
results and noted a slightly elevated amount of creatinine, which indicated a
lower level of kidney functioning.   Id. ¶ 20.   She ordered a follow-up visit by Dr.
Wessel.   Id.

Mr. Hunt was seen by RN Good on December 3, 2012.   (Docket 57 ¶ 27).
She prescribed Prilosec, Milk of Magnesia and Zantac.   Id. ¶ 28.   On December
5, Mr. Hunt was seen by Dr. Wessel.   (Docket 69 ¶ 21).   Dr. Wessel ordered a

stool softener medication, increased Zantac as needed, and ordered Milk of Magnesia at bedtime if there was no bowel movement that day.   Id. ¶ 21.   On December 8, 2012, Mr. Hunt requested an increase of Milk of Magnesia.   Id. ¶ 22.   RN Alexander informed him that he was only able to have Milk of Magnesia one time in the evening "if you have not had a bowel movement that day."   Id. ¶ 23.

On December 17, Mr. Hunt asked to see a specialist.   (Docket 57 ¶ 30).   The next day another jail staff registered nurse advised Mr. Hunt his request was forwarded to a medical provider, presumably Dr. Wessel.   Id. ¶ 31.   On December 27, Mr. Hunt complained "I am still having the same issues with my stomach.   I can only eat one meal a day because the food continues to sit and not digest properly.   This has been going on now for three months and I've been very patient going through protocol.   I would now like to be seen by a specialist because there is seriously something wrong and the three doctors I've seen has [sic] not resolved the problem."   (Docket 69 ¶ 24).   RN Good advised Mr. Hunt it was Dr. Wessel's decision whether to refer him to a specialist.   (Docket 57 ¶ 69).   On December 30, Mr. Hunt e-mailed Mr. Yantis, a captain on the jail staff, asking that his digestive issues be immediately addressed.   Id. ¶ 34.

On January 6, 2013, Mr. Hunt showed vomit in his toilet to a jail officer. (Docket 69 ¶ 27).   The vomit had corn in it and the last time corn had been served was three days prior.   Id.   This staff member told Mr. Hunt he should file a grievance.   (Docket 57 ¶ 36).   On January 8, Mr. Hunt was seen kneeling next

to his bed with his head lying on the mattress.   (Docket 69 ¶ 28).   He told medical staff this was how he coped with his indigestion.   Id.   As he was rising to sit on his bed, Mr. Hunt belched loudly several times.   Id.   When asked if he wanted to see a provider, Mr. Hunt stated that the jail providers had not helped and he wanted to see "his own doctor."   Id.

On January 9, 2013, Mr. Hunt was seen by Dr. Wessel.   Id. ¶ 29.   Mr. Hunt described the corn in his vomit and asked to see a specialist for his stomach issues.   Id.   Dr. Wessel increased the Zantac dosage and ordered that Mr. Hunt be scheduled for a colonoscopy.   Id. ¶ 30.   Dr. Wessel ordered Mr. Hunt to drink a gallon of Colyte, an electrolyte solution, "to clean out."   Id. Another prescription for a stool softener was issued.   (Docket 57 ¶ 38).

Dr. Wessel testified that in early January he was referring Mr. Hunt to a gastrointestinal ("GI") physician.   Id. ¶ 40.   Mr. Hunt was referred to the GI physicians at the Rapid City Medical Center ("RCMC") for a colonoscopy to be performed by January 22, 2013.   Id. ¶ 45; see also Docket 68 ¶ 45.   Dr. Wessel testified that patients are often referred to GI physicians for one procedure, like a colonoscopy, but it is common once the patient arrives for the procedure that additional or alternative procedures take place.   (Docket 57 ¶ 47).

On January 11 Mr. Hunt was called to the medical room to drink the Colyte.   (Docket 69 ¶ 31).   Because he was feeling nauseous, Mr. Hunt declined, but stated he would make every effort to take it the next day.   Id.

The next day Mr. Hunt drank 4/5 gallon of Colyte.  Id. ¶ 32.  After being informed he was scheduled for a colonoscopy, Mr. Hunt e-mailed Captain Yantis.  (Docket 57 ¶ 47).  Mr. Hunt was told he would have an opportunity to discuss his concerns at the colonoscopy.  Id. ¶ 48.  Two days later a jail medical staff member called RCMC to schedule Mr. Hunt's colonoscopy.  Id. ¶ 33.  She was informed the clinic would need current notes, diagnoses and laboratory test results to review prior to scheduling the colonoscopy.  Id.  After the records were reviewed, RCMC planned to call back and give jail staff an appointment time and date.  Id.

On January 21, 2013, Mr. Hunt e-mailed Captain Yantis with more complaints.  Id. ¶ 49.  Captain Yantis responded, indicating a colonoscopy had been scheduled.  Id. ¶ 50.  On January 22, Mr. Hunt received the paperwork necessary for scheduling the colonoscopy at RCMC.  (Docket 69 ¶ 34).  That same day a jail staff member faxed to RCMC the materials necessary to refer Mr. Hunt for a colonoscopy.  Id. ¶ 35; see also Docket 60-1 at pp. 14-17.

On January 25, Mr. Hunt informed the jail medical staff that he had been vomiting every day, was feeling nausea and experiencing stomach pain.  (Docket 69 ¶ 36).  Mr. Hunt was assessed and given antacids.  Id.  On January 29, a jail medical staff member called RCMC and left a message inquiring about the status of Mr. Hunt's colonoscopy.  Id. ¶ 37.  A RCMC employee called back on January 30, 2013.  Id. ¶ 38.  They advised the jail that Mr. Hunt's procedure would have to be done at the Rapid City Regional Hospital ("RCRH") because RCMC was booked through February.  Id.  They indicated Mr. Hunt would be placed on a waiting list

10

and the jail medical staff could call back in mid-to-late February for a March appointment at RCMC.   Id.

On February 16, Mr. Hunt was assessed by a jail medical staff member due to complaints of chest pain.   Id. ¶ 39.   He reported it felt like he was having a heart attack and vomited during the examination.   Id.   Mr. Hunt reported he had been vomiting almost every day for quite some time.   Id.   The next day a member of the jail staff witnessed Mr. Hunt vomit.   Id. ¶ 40.   On February 18, a member of the jail medical staff called RCMC and left a message inquiring about a possible date for Mr. Hunt's colonoscopy.   Id. ¶ 41.

On February 20, a jail medical staff member called RCRH to schedule Mr. Hunt's procedure.   Id. ¶ 42.   The hospital indicated the jail could not set the appointment, but rather a physician must do so.   Id.   RCMC was then called, seeking an appointment for Mr. Hunt.   Id.   RCMC scheduled Mr. Hunt for an appointment on March 6, 2013, at RCMC.   Id.

On March 6, Mr. Hunt was seen at RCMC by Dr. Loyal Tillotson, a gastroenterologist.   Id. ¶ 45.   Mr. Hunt described his symptoms and expressed his opinion that he did not need a colonoscopy.   Id.   That same day Dr. Tillotson performed a duodenal endoscopy.[4]   (Dockets 57 ¶ 51; 60-1 at p. 19 & 69 ¶46).

---

4Sometime prior to the procedure, Mr. Hunt consumed another gallon of Colyte.   (Docket 69 ¶ 43).

Dr. Tillotson diagnosed "acquired duodenal stenosis."[5]   (Dockets 57 ¶ 52 & 69 ¶ 47).   The stenosis was severe, so no attempt was made to dilate the duodenum due to the "large amount of retained gastric contents" in the bottom of Mr. Hunt's stomach.   (Docket 69 ¶ 47).   A biopsy revealed "acute and chronic inflammation" due to a duodenal ulcer.   Id. ¶ 48.   Mr. Hunt was scheduled for a follow-up examination in one to two weeks.   Id. ¶ 50.   In the meantime, he was on a clear diet only.   Id.

Between August 2012 and January 2013, Mr. Hunt lost twelve pounds. (Dockets 57 ¶ 15 & 69 ¶¶ 51-54).   Dr. Wessel testified it was not uncommon for inmates to lose that amount of weight.   (Docket 57 ¶ 16).   By March 10, 2013, Mr. Hunt lost an additional twenty-three pounds.   (Docket 69 ¶¶ 55 & 57).   On March 14, 2013, Mr. Hunt had gained nine pounds and his weight over the next few months remained at that level.   Id. ¶¶ 58 & 59.

On March 19, 2013, Dr. Sanford Herold performed a second endoscopy. (Docket 57 ¶ 54).   Dr. Herold again observed acquired duodenal stenosis and performed a dilation.   Id. ¶¶ 55 & 56.   The doctor recommended Mr. Hunt drink four ounces of Coca-Cola twice a day to dissolve bezoar, a solid mass of indigestible

---

[5]"Adult or acquired hypertrophic pyloric stenosis (AHPS) is a disorder that occurs when the opening (pylorus) between the stomach and the first part of the small intestine (duodenum) becomes partially or completely blocked. . . . This results in inflammation, swelling (edema), and mononuclear cell infiltration. Primary AHPS can occur without any apparent cause (idiopathic).   Secondary AHPS results from other problems in the gastrointestinal tract."   MDGuidelines, www. mdguidelines.com/pyloric-stenosis-acquired-adult-hypertrophic, last visited September 11, 2015.

food in his stomach, be on a low-fiber diet, and have a follow-up endoscopy. (Dockets 57 ¶ 56 & 69 ¶ 61).

On March 25, Mr. Hunt complained about not receiving the Coca-Cola and Dr. Wessel wrote a separate order approving Dr. Herold's instructions.   (Docket 69 ¶ 62).   The jail had never provided Coca-Cola to an inmate before so it had to be separately purchased.   (Docket 57 ¶ 58).   After a few days the soda was provided to Mr. Hunt.   Id. ¶ 57.

On April 23, 2013, Mr. Hunt had a third endoscopy and another dilation was performed.   Id. ¶ 59.   Dr. Herold prescribed Prilosec "indefinitely," and Mr. Hunt believes he will have to take the medication for the rest of his life.   Id. ¶¶ 60, 61, 62; see also Docket 68 ¶ 60.

Mr. Hunt is currently under the medical care of the South Dakota State Penitentiary.   (Docket 57 ¶ 64).   He continues to experience epigastric pain as a result of the duodenal obstruction.   (Docket 69 ¶ 66).   Mr. Hunt had no history of digestive problems or weight loss before entering the Pennington County Jail on August 25, 2012.   Id. ¶¶ 64 & 67.

## DISCUSSION

Count I of Mr. Hunt's complaint asserts a violation of 42 U.S.C. § 1983 claiming cruel and unusual punishment under the Fourteenth Amendment against the County Defendants.   (Docket 37 at pp. 9-10).   Count II asserts a medical negligence claim under the Fourteenth Amendment against Dr. Wessel for his services as a contract physician for the jail.   Id. at pp. 10-11.

Mr. Hunt's right to medical care, as a pretrial detainee in state custody, is "analyzed under the Fourteenth Amendment's Due Process Clause rather than the Eighth Amendment." Crow v. Montgomery, 403 F.3d 598, 601 (8th Cir. 2005) (citing Owens, 328 F.3d at 1027).   This makes little practical difference because "[p]retrial detainees are entitled to the same protection under the Fourteenth Amendment as imprisoned convicts receive under the Eighth Amendment." Kahle v. Leonard, 477 F.3d 544, 550 (8th Cir. 2007).

Because the court's decision on plaintiff's claim against Dr. Wessel in count II impacts the analysis of the claim against the County Defendants, the court will first address Dr. Wessel's motion for summary judgment.

**DR. WESSEL**

"Section 1983 creates a cause of action against a person acting 'under color of any statute . . . of any State' who deprives another of a federally protected right." Carlson v. Roetzel & Andress, 552 F.3d 648, 650 (8th Cir. 2008) (citing 42 U.S.C. § 1983).   "Only state actors can be held liable under Section 1983." Id. (citing Youngblood v. Hy-Vee Food Stores, Inc., 266 F.3d 851, 855 (8th Cir. 2001)).   The United States Supreme Court recognized that "[a]n inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met." Estelle v. Gamble, 429 U.S. 97, 103 (1976). Because of this, every state and its county jails have a constitutional obligation to provide adequate medical care to their inmates.   Id.   When Dr. Wessel contracted with Pennington County to provide medical services to its jail

14

inmates, the county "defers to [his] medical judgment, in order to fulfill this obligation."  West v. Atkins, 487 U.S. 42, 55 (1988).   "By virtue of this relationship, . . . Doctor [Wessel] is authorized and obliged to treat prison inmates . . . . He does so 'clothed with the authority of state law.' "  Id. (citing United States v. Classic, 313 U.S. 299, 326 (1941)).   Dr. Wessel is "a person who may fairly be said to be a state actor."  Id. (citing Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982)).   "If Doctor [Wessel] misused his power by demonstrating deliberate indifference to [Mr. Hunt's] serious medical needs, the resultant deprivation was caused, in the sense relevant for state-action inquiry, by the State's exercise of its right to punish [Mr. Hunt] by incarceration and to deny him a venue independent of the State to obtain needed medical care."  Id. Dr. Wessel is a state actor for purposes of Mr. Hunt's § 1983 claim.

Mr. Hunt alleges Dr. Wessel committed medical malpractice in the care and treatment he provided.   (Docket 48-1 ¶ 1).   Dr. Wessel testified he is familiar with the standard of care applicable to family practice physicians practicing in South Dakota under the same or similar circumstances as those alleged in the complaint.[6]   (Docket 48-2 ¶ 5).   Dr. Wessel acknowledges he saw Mr. Hunt multiple times beginning in October 2012 for various conditions, including abdominal discomfort.   Id. ¶ 4.   Dr. Wessel claims that the medications he initially prescribed Mr. Hunt produced great improvement.   Id.

---

[6]Mr. Hunt does not deny the contents of Dr. Wessel's affidavit, but asserts those statements are not relevant to plaintiff's claims.   (Docket 67 ¶ 5).

When those medications became less effective, Dr. Wessel referred Mr. Hunt to a gastroenterologist for consultation.   Id.   Dr. Wessel states the specialist diagnosed an obstruction which was then treated.   Id.   Dr. Wessel testified that the care and treatment he provided met the applicable standard of care and that he caused no harm to Mr. Hunt.   Id. ¶¶ 6 & 7.

Dr. Wessel moves for summary judgment on the claim against him because Mr. Hunt failed to identify an expert witness to testify in support of plaintiff's claims.   (Docket 48-3 at p. 2).   Dr. Wessel submits that both South Dakota and federal law require expert testimony to "prove that the doctor's care deviated from the standard of care, that such deviation caused damages or injury to the Plaintiff, and the nature and extent of damages."   Id.   "Without expert testimony," Dr. Wessel argues Mr. Hunt "fails to tender a prima facia case permitting him to proceed."   Id. at p. 3.

Mr. Hunt counters that "although medical negligence does not violate the eighth amendment . . . medical treatment may so deviate from the standard of care as to evidence a physician's deliberate indifference."   (Docket 70 at p. 15) (quoting McRaven v. Sanders, 577 F.3d 974, 983 (8th Cir. 2009) (internal quotation marks and addition citation omitted).   Mr. Hunt claims his progression of digestive symptoms, significant weight loss and severe pain put Dr. Wessel on notice that his course of treatment was ineffective.   Id. at p. 16. He submits "because of Dr. Wessel's deliberate, careless and reckless indifference to Hunt's ever worsening condition when he had authority to do

more but did not care enough to pursue[,]" Dr. Wessel is liable for money damages.   Id.

"[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.   Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.   In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.   It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment."   Estelle, 429 U.S. at 106.   "[W]hether . . . additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment."   Id. at 107.

Mr. Hunt claims he repeatedly expressed displeasure and objections to the course of treatment provided by Dr. Wessel.   However, "a healthcare provider need not accept as true medical judgments offered by their patients but must make treatment decisions on the basis of many factors, only one of which is [a] patient's input."   Allard v. Baldwin, 779 F.3d 768, 772-73 (8th Cir. 2015).   See also Phillips v. Jasper County Jail, 437 F.3d 791, 795 (8th Cir. 2006) (mere disagreement with treatment decisions does not rise to level of constitutional violation).   "To prevail on a deliberate indifference claim, [Mr. Hunt] must show more than even gross negligence. . . . [he] must establish a mental state akin to

17

criminal recklessness: disregarding a known risk to the inmate's health." Id. at 862 (internal quotation marks and citations omitted).

To establish his claim, Mr. Hunt must prove "that he had 'objectively serious medical needs' and that Dr. [Wessel] 'actually knew of but deliberately disregarded those needs . . . ." Moore v. Duffy, 255 F.3d 543, 545 (8th Cir. 2001) (quoting Roberson v. Bradshaw, 198 F.3d 645, 647 (8th Cir.1999)).   Proof of deliberate indifference requires "something more than negligence but less than actual intent to harm; it requires proof of a reckless disregard of the known risk . . . ." Id. (internal quotation marks and additional citations omitted). "Although medical negligence does not violate the eighth amendment . . . [it is undisputed] that it was 'clearly established' when [a physician] treated [the plaintiff] that medical treatment may so deviate from the applicable standard of care as to evidence a physician's deliberate indifference . . . " Id. (referencing Smith v. Jenkins, 919 F.2d 90, 93 (8th Cir. 1990).   "[W]hether such a significant departure from professional standards occurred is a factual question requiring expert opinion to resolve . . . ." Id. (referencing Smith, 919 F.2d at 93). Conflicts between opposing expert witnesses' testimony are "sufficient to raise questions of fact as to whether [Dr. Wessel's] actions or failures constituted deliberate indifference." Bennett v. Miles, 603 F. App'x 507, 509 (8th Cir. 2015).

Mr. Hunt has not identified an expert who would testify Dr. Wessel deviated from the standard of care in providing treatment or that he caused any harm to Mr. Hunt.   The deadline for plaintiff to disclose his expert expired on

18

December 17, 2014.   (Docket 47 ¶ 1).   While Mr. Hunt makes an impassioned argument to advance his claim, he fails to provide any expert testimony to support the claim.   The court cannot rely on speculation or conjecture to conclude any perceived delays in additional treatment, delayed referrals to other specialists or other objections to the care provided in some fashion aggravated or prolonged Mr. Hunt's physical condition.   Those medical determinations can only be made by a qualified expert.   There is no evidence Dr. Wessel acted with deliberate indifference to Mr. Hunt's medical needs.

Mr. Hunt's claim against Dr. Wessel fails as a matter of law.   Dr. Wessel's motion for summary judgment is granted.

### COUNTY DEFENDANTS

OFFICIAL CAPACITY CLAIMS

Mr. Hunt sued the County Defendants in their individual and official capacities.   "Defendants . . . actions . . . were done by each of them individually and also pursuant to the policies of the Pennington County Jail."   (Docket 37 ¶ 39).   See also Docket 70 at p. 3 ("All Defendants are sued in both their individual and official capacities . . . .").

"[A] suit against a public official in his official capacity is actually a suit against the entity for which the official is an agent."   Parrish v. Ball, 594 F.3d 993, 997 (8th Cir. 2010) (quoting Elder–Keep v. Aksamit, 460 F.3d 979, 986 (8th Cir. 2006)).   The Eighth Circuit determined law enforcement personnel are public officials.   Id. (determining a county sheriff to be a public official).

19

However, a county jail is not an entity subject to suit.   See Owens v. Scott County Jail, 328 F.3d 1026, 1027 (8th Cir. 2003) ("[C]ounty jails are not legal entities amenable to suit").

Mr. Hunt argues his complaint seeks "prospective relief [and therefore] state actors officials [sic] acting in their official capacities are considered 'persons' for purposes of § 1983 . . . ."   (Docket 70 at p. 3) (referencing Murphy v. Arkansas, 127 F.3d 750, 754 (8th Cir. 1997)).   When a party seeks "prospective injunctive relief, no money damages are available."   Gibson v. Arkansas Department of Corrections, 265 F.3d 718, 721 (8th Cir. 2001).   Mr. Hunt's complaint does not seek "equitable relief such as reinstatement of a state employee."   Murphy, 127 F.3d at 754.   The complaint seeks money damages and punitive damages.   (Docket 37 at p. 11).

Mr. Hunt's claims against the County Defendants in their official capacities are suits against Pennington County.   Parrish, 594 F.3d at 997.   Mr. Hunt has not sued Pennington County, South Dakota.   "Section 1983 damage claims against the [County Defendants] acting in their official capacities are . . . barred, either by the Eleventh Amendment or because in those capacities they are not 'persons' for § 1983 purposes."   Id.

The County Defendants' motion for summary judgment as to claims against them in their official capacities is granted.

20

INDIVIDUAL CAPACITY CLAIMS

"Personal capacity claims . . . are those which allege personal liability for individual actions by officials in the course of their duties . . . and qualified immunity may be raised as a defense."  <u>Gorman v. Bartch</u>, 152 F.3d 907, 914 (8th Cir. 1998).  "Government officials performing discretionary functions are shielded from liability for civil damages in § 1983 actions unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.' "  <u>Foulks v. Cole County, Missouri</u>, 991 F.2d 454, 456 (8th Cir. 1993) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).  "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  <u>Id.</u> (quoting <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987)).  The County Defendants "are entitled to qualified immunity unless the answer to both questions is yes."  <u>McCaster v. Clausen</u>, 684 F.3d 740, 746 (8th Cir. 2012).

"It is well established that deliberate indifference to [an] inmate's serious medical needs is cruel and unusual punishment in violation of the Eighth Amendment."  <u>Id.</u>  "To establish deliberate indifference, plaintiff[] must prove an objectively serious medical need and that prison officials knew of the need but deliberately disregarded it. . . . The second part of the test requires [plaintiff] to prove that the nurses were more than negligent. . . . . Rather, [plaintiff] must show that the nurses' mental state was akin to criminal recklessness."  <u>Id.</u> (internal quotation marks and citations omitted).

The County Defendants concede for purposes of the motion for summary judgment that Mr. Hunt had a serious medical need.   (Docket 56 at p. 8).   They dispute, however, that Mr. Hunt can show any of the County Defendants "deliberately disregarded it."   Id.

The record supports the County Defendants' position they were not deliberately indifferent to Mr. Hunt's medical needs.   RN Good and RN Alexander promptly addressed Mr. Hunt's digestive conditions and referred him to both P.A. Hagan and Dr. Wessel on numerous occasions.   There is no evidence that either registered nurse or Captain Yantis interfered with Mr. Hunt's access to the doctor or his P.A.

When Mr. Hunt complained of pain, the nurses sought intervention from Dr. Wessel so that Mr. Hunt's prescriptions could be increased.   The evidence does indicate that one of the nurses failed to properly increase the dosage of Mr. Hunt's omeprazole prescription.   At most, this suggests negligence on their part in providing that medication in the quantity or frequency directed by Dr. Wessel. But that conduct does not rise to the level of "criminal recklessness" or "deliberate indifference" to Mr. Hunt's medical needs.   McCaster, 684 F.3d at 746.

There are frequent episodes when Mr. Hunt's digestive discomfort and pain increased to such a level that the nurses went outside the jail staff to seek medical intervention on Mr. Hunt's behalf.   During those times when outside medical help was not sought, the nurses examined Mr. Hunt and made what

appear to be appropriate adjustments to his non-prescription antacids and other treatment aids.   Whether the nurses properly or improperly treated Mr. Hunt for GERD or misdiagnosed his condition, they referred him to an outside physician who completed his own examination and treatment recommendations.   The nurses' "misdiagnosis does not rise to the level of deliberate indifference." <u>Allard</u>, 779 F.3d at 772.   Mr. Hunt failed to establish his claim by showing the jail medical staff "so deviated from professional standards that it amounted to deliberate indifference."   <u>Smith</u>, 919 F.2d at 93.

When Mr. Hunt approached Captain Yantis seeking different medical care or health care providers, the record shows that those inquiries were properly referred back to the jail's staff physician, Dr. Wessel, or his P.A.   Captain Yantis' decision not to bypass Dr. Wessel to provide Mr. Hunt with access to other medical care providers does not constitute deliberate indifference.   Those treatment decisions belong to Dr. Wessel, not to an administrative jail officer.

Examining the evidence in the light most favorable to Mr. Hunt, the care and treatment provided by the County Defendants was "not so ineffective as to be criminally reckless and therefore rise to the level of deliberate indifference." <u>Allard</u>, 779 F.3d at 773.   The County Defendants are entitled to qualified immunity.   The County Defendants' motion for summary judgment is granted.

## ORDER

Based on the above analysis, it is

23

ORDERED that Dr. Wessel's motion for summary judgment (Docket 48) is granted.

IT IS FURTHER ORDERED that the County Defendants' motion for summary judgment (Docket 55) is granted.

IT IS FURTHER ORDERED that the plaintiff's second amended complaint (Docket 37) is dismissed with prejudice.

Dated September 26, 2015.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
CHIEF JUDGE

24